# EXHIBIT A

ROBERT HOLDHEIM
821 Bay St., #C4
Santa Monica, CA 90405
(650) 888-8667 – phone
RHoldheim@Gmail.com

*In Pro Per*

CONFORMED COPY
~~ORIGINAL FILED~~
Superior Court of California

FEB 1 9 2019

Sheri R. Carter, Executive Officer/Clerk
By: Cristina Grijalva, Deputy

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES, CENTRAL DISTRICT

19STCV05103

| | |
|---|---|
| ROBERT HOLDHEIM, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>ENGINEER.AI CORP., a business association, form unknown; SD SQUARED NORTH AMERICA LIMITED, doing business in California as SD2 NORTH AMERICA LIMITED, a Delaware corporation; SACHIN DEV DUGGAL, an individual; and DOES 1 through 50, inclusive,<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF**<br><br>1. **WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY;**<br><br>2. **AGE DISCRIMINATION;**<br><br>3. **RETALIATION;**<br><br>4. **FAILURE TO PREVENT DISCRIMINATION;**<br><br>5. **VIOLATION OF LABOR CODE SECTION 970;**<br><br>6. **PROMISSORY ESTOPPEL; AND**<br><br>7. **DEFAMATION**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff ROBERT HOLDHEIM alleges and complains as follows:

/ / /

1
COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

**GENERAL ALLEGATIONS**

Plaintiff ROBERT HOLDHEIM, for his Complaint against defendants ENGINEER.AI. CORP., a business association, form unknown, SD SQUARED NORTH AMERICA LIMITED, doing business in California as SD SQUARED NORTH AMERICA LIMITED, a Delaware corporation, and SACHIN DEV DUGGAL, an individual, hereby states and alleges as follows:

**PARTIES**

1. <u>Plaintiff</u>:  Plaintiff ROBERT HOLDHEIM ("HOLDHEIM") is an individual residing in and within the County of Los Angeles, State of California.

2. Defendants:

(a) Defendant ENGINEER.AI CORP ("ENGINEER.AI"), is a business association, form unknown, with its principal and only place of business in the United States located at 12130 Millennium Drive, Los Angeles, CA 90094 in Playa Vista, County of Los Angeles, State of California. On information and belief, to the extent that it has any legitimacy as a business association, ENGINEER.AI is an information technology, software engineering and web design technology start-up company.

(b) Defendant SD SQUARED NORTH AMERICA LIMITED, doing business in California as SD2 NORTH AMERICA LIMITED ("SD SQUARED"), is, and at all times referenced herein was, a Delaware corporation with its principal and only place of business in the United States located at 12130 Millennium Drive, Los Angeles, CA 90094 in Playa Vista, County of Los Angeles, State of California. SD SQUARED was founded and is principally owned by two individuals – Sachin Dev Duggal and Saurabh Dhoot.  On information and belief, SD SQUARED is the actual information technology, software engineering and web design technology start-up company which does business as "ENGINEER.AI" and changed its name in or about 2017 in order to escape the stigma of dozens of negative reviews on Glassdoor® and other websites which post employee reviews of the business environment and working conditions of employers.

2

1    (c)    Defendant SACHIN DEV DUGGAL ("DUGGAL"), believed to be a citizen of

2    the United Kingdom, is an individual residing in various cities internationally, including London,

3    San Francisco and Beverly Hills, State of California, who promotes himself as the co-founder

4    and Chief Executive Officer of both ENGINEER.AI and SD SQUARED.

5

6    3.    Doe Defendants:    The true names of Defendants DOES 1-50 presently are

7    unknown to HOLDHEIM and HOLDHEIM sues them by fictitious names.  HOLDHEIM will

8    amend this Complaint upon discovery of the true names of DOES 1-50.   HOLDHEIM is

9    informed and believes, and thereon alleges, that said DOES are in some manner legally

10   responsible for the events and happenings herein and caused injury and damage to HOLDHEIM

11   as set forth below.  Reference herein to "DEFENDANTS" shall include and refer to all named

12   defendants and all fictitiously named DEFENDANTS and DOES 1-50.

13

14   **AGENCY RELATIONSHIP**

15   4.    Except as expressly alleged to the contrary or in the alternative for those causes of

16   action where DUGGAL is named as an individual defendant, HOLDHEIM is informed and

17   believes, and upon such information and belief alleges, that at all times relevant hereto, each of

18   the DEFENDANTS was the employer or employee, joint venturer, partner, agent and/or co-

19   conspirator of each of the remaining DEFENDANTS, and in doing each and all of the things

20   hereinafter alleged, was acting within the scope and purpose of his or her authority as such

21   employer, employee, joint venturer, partner, agent and/or co-conspirator and with the permission,

22   consent and ratification, whether express or implied, of each of the remaining DEFENDANTS.

23   On information and belief, each of the defendants sued as DOES 1 through 50 is in some manner

24   legally responsible for the injuries to HOLDHEIM.

25   ///

26   ///

27   ///

28   ///

3

**JURISDICTION AND VENUE**

5.    This Court has personal jurisdiction over defendants ENGINEER.AI, SD SQUARED AND DUGGAL, as all reside and do business in Los Angeles County, State of California, and a substantial part of the events or omissions giving rise to the claims alleged herein occurred in Los Angeles County.  As alleged hereinabove, HOLDHEIM is a resident of Los Angeles County and a citizen of the State of California while defendant SD SQUARED is a Delaware corporation doing business throughout the United States with its principal place of business in Los Angeles County, State of California.  As of the date this Complaint is filed, ENGINEER.AI is not identified, certified or registered as a legitimate business entity with the California Secretary of State. HOLDHEIM is informed and believes, and thereon alleges, that discovery will confirm that all DEFENDANTS possess more than the requisite "minimum contacts" with the State of California to be subject to the Court's jurisdiction.  The matter in controversy in this action, exclusive of costs and interest, exceeds $5,000,000 (which is in excess of the requisite jurisdictional minimum of this Court).

**JOINT EMPLOYER RELATIONSHIP**

4.    Except as expressly alleged to the contrary or in the alternative for those causes of action where DUGGAL is named as an individual HOLDHEIM is informed and believes, and thereon alleges, that ENGINEER.AI and SD SQUARED functioned as a "joint employer." In this regard, HOLDHEIM is informed and believes, and thereon alleges, that ENGINEER.AI and SD SQUARED have centralized control of management and labor relations functions.  Further, HOLDHEIM is informed and believes, and thereon alleges, that there is common management between and among ENGINEER.AI and SD SQUARED, including, but not limited to, shared officers and executives (including defendant DUGGAL), interlocking directorships, shared investors, shared agents for the service of process, shared operational facilities and shared employees.  In addition, HOLDHEIM is informed and believes, and thereon alleges that, ENGINEER.AI and SD SQUARED have functionally integrated their operations including, but not limited to, shared offices, shared management, shared revenue and shared employees.

1   HOLDHEIM is further informed and believes, and based thereon alleges, that ENGINEER.AI
2   and SD SQUARED have common ownership and/or financial control, and that they share a
3   common purpose to engage in similar business pursuits such that they are substantially similar in
4   terms of operations.  The two companies are essentially "alter egos" of each other and both
5   ENGINEER.AI and SD SQUARED fall within the definition of a "joint employer" under the
6   principles articulated by the California Supreme Court in *Martinez v. Combs* (2010) 49 Cal. 4th
7   35.  Accordingly, in order to avoid the fraud and injustice that would occur if an adherence to the
8   fiction of "separateness" of the various entities were allowed, any recovery by HOLDHEIM as
9   against ENGINEER.AI should be found to be binding on SD SQUARED, jointly and separately,
10   and *vice versa*.  For purposes of this Complaint, references to the "COMPANY DEFENDANTS"
11   as used herein is intended to refer to ENGINEER.AI and SD SQUARED, collectively, in their
12   capacity as "joint employers.

13

14   **NATURE OF DEFENDANTS' BUSINESS**

15       5.       According to its promotional materials (including a page on Crunchbase.com),
16   ENGINEER.AI is an "artificial intelligence, information technology, software, software
17   engineering, web design and web development" company founded in 2012 that allows "anyone
18   with an idea [to] create and operate the lifecycle of any bespoke digital project."  According to
19   other promotional materials, ENGINEER.AI claims:

20       "We are doing to Software Development what Henry Ford did
21       to Car Manufacturing; mechanizing the process by putting it on
         the Assembly line which connects AI [artificial intelligence] &
22       Human teams; thereby streamlining, automating and reducing
23       cost.  2x the speed at ⅓ the price.  It is a collision of intelligent
         automation, ideas, and human talent that allows you to build any
24       tech project transparently.  [¶]
25       We don't charge our customers for every line of code; but
26       rather what's unique to them; letting them build upon our
         extensive & growing library of Feature Components 'Code Pods'
27       so they are not paying for code we have written elsewhere.
28       Everything in Engineer.ai happens within the customer's browser

5
COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

from pricing to speaking to their team; at their fingertips and at
their convenience.

We use artificial intelligence to automate everything possible
and a deep-network of vendors for everything else; this lets us
deliver three core promises: [1] Always on Budget: Transparent
Pricing with a Guaranteed Cost.  [2] Wicked Fast: Faster Build
through innovation the process. Engineer.ai is a Human-assisted
AI that empowers everyone to independently build & operate
tech products through two products that work together to be
their virtual engineering team.  [3] Always there: Full Lifecycle
from Build to Operating on the Cloud."

HOLDHEIM is informed and believes, and thereon alleges, that the COMPANY
DEFENDANTS are both effectively controlled by DUGGAL who oversees and directs all
employees employed by both companies who perform sales, marketing and technology functions
at the Playa Vista, California headquarters and at satellite offices located in London, England,
and Guragon, India.

## FACTS GIVING RISE TO THE COMPLAINT

### Holdheim's Employment History

6.      HOLDHEIM has had a long and distinguished career as an entrepreneur, senior
corporate executive and C-suite consultant. Following his studies at Cornell University (BA) and
Johns Hopkins School of Advanced International Studies (MA), he began his career in Germany
during the collapse of the Berlin Wall and the Iron Curtain, where he helped American
companies pursue investment opportunities. His career with the marketing services company
known simply as Edelman spanned 15 of the next 25 years, including stints working in the
Frankfurt, London, New York, New Delhi/Mumbai, Dubai/Abu Dhabi, Hong Kong and Berlin
offices. Over the years, he provided marketing consultation services for a broad array of clients
across industry sectors, including Starbucks, Samsung, Harley Davidson, Audi, Adidas/Reebok,
Diageo, Walmart, United Parcel Service, PriceWaterhouse Coopers, General Electric, the Tata
Group (holding company plus 28 subsidiary companies), Kohlberg, Kravis Roberts (KKR),
McGraw Hill, Mubadala, Dubai Tourism, the Indian Government, the Bill & Melinda Gates

Foundation, Microsoft, Blackberry (RIM) and LinkedIn, among many others.  HOLDHEIM took a 10-year hiatus between his two stints at Edelman to found and build a consumer products company in the personal care space, ultimately selling the brand he had created to a private equity firm.  He returned to Edelman thereafter where, after a stint in New York helping clients manage the global financial crisis in 2007-09, his focus was on building operations in emerging markets. As Managing Director of the Indian operation of Edelman, he transformed a failing division in two cities and built it into a powerhouse across eleven cities in just four years. As the CEO of Edelman's South Asia, Middle East and Africa regions, he tripled the size of the UAE operation while managing the company's entry into Africa and Saudi Arabia.  In these roles HOLDHEIM carried out three acquisitions on behalf of the company and signed exclusive partnerships with independent firms in another ten countries.   Over an 8-year period HOLDHEIM grew a region of approx. 70 people generating roughly $5-7 million in revenue to a team of over 600 people spread across 15 offices in 5 countries with revenue of approx. $45 million annually.  HOLDHEIM's enormous talents and experience helping grow, develop and market businesses over his long career are unparalleled, and his vast network of client and investor contacts in Europe, Asia and India were well-known across the globe.

<u>Recruitment of Holdheim</u>

7.      In or about 2011, during his tenure at Edelman, HOLDHEIM met DUGGAL, then a client of the firm, and successfully performed marketing services for his cloud-computing company Nivio. In addition to their professional relationship, HOLDHEIM and DUGGAL developed a friendship and stayed in contact over the years.  Eventually, and for a variety of reasons, HOLDHEIM decided to leave Edelman to explore new and other opportunities.  In early 2018, HOLDHEIM (then living in Berlin, Germany) spoke with DUGGAL who, upon learning that HOLDHEIM was looking to leave Edelman, undertook active and concerted efforts to recruit HOLDHEIM to join his new company which he referred to as "ENGINEER.AI." Although DUGGAL was fully-aware that HOLDHEIM then resided in Berlin, Germany, he urged HOLDHEIM to come onboard and become the "Chief Business Officer" (described by

7

1  DUGGAL as second-highest ranking executive officer in the company overseeing the day-to-day

2  business operations of ENGINEER.AI worldwide).  DUGGAL urged HOLDHEIM to apply his

3  vast business-building expertise to help him build DUGGAL's new company into a fully-funded

4  and thriving technology firm. Thereafter followed a flurry of calls with DUGGAL, his co-

5  founder Saurabh Dhoot, and several Company advisors, all centered on inducing HOLDHEIM to

6  accept the offer of employment with ENGINEER.AI.  HOLDHEIM's prior relationships with

7  DUGGAL's Sales Head for India/Asia, Varghese Cherian, and with his Chief of Staff, Sheetal

8  Kadyan, were also leveraged (as both had worked for HOLDHEIM when he headed the Indian

9  operation of Edelman some years before).  Based on what he was told during the recruitment

10  process, HOLDHEIM saw what he considered to be a fairly-typical picture for a start-up:

11  ENGINEER.AI was founded on a great idea, but lacked management oversight and any

12  discernible operational structure or strategy.  All decisions, even on the smallest of issues (like

13  travel arrangements), were made by exclusively by DUGGAL (who also closely held all

14  information about the Company's finances).  HOLDHEIM felt it was not a surprise why the

15  Company's efforts to date in raising funds and building a viable U.S. business had failed.  The

16  challenge of building teams and operations across the world while attracting financing appealed

17  to HOLDHEIM given his prior expertise in doing so for Edelman and its clients.

18

19                    <u>Job Offer Extended to (and Accepted by) Holdheim</u>

20       8.     At the same time that he was being recruited to join ENGINEER.AI,

21  HOLDHEIM was being courted to accept employment with a global consumer products giant

22  with a salary expected in the range of $400,000 annually, a compensation level which a start-up

23  company like ENGINEER.AI could not compete.  DUGGAL and others who worked for him

24  were aware of the competing offer, so to induce HOLDHEIM to forego the other opportunity and

25  join ENGINEER.AI, DUGGAL offered HOLDHEIM not only a base salary of $200,000

26  annually, but also bonus compensation, health insurance for himself and his family, and a

27  significant equity ownership stake in the company if he were willing to accept the job and

28  relocate to California to assume the Chief Business Officer role. Based on DUGGAL's

1   representations that HOLDHEIM's role would be to take his vision as co-founder and
2   operationalize it as the Company's No. 2 executive, initially by building the U.S. and European
3   markets and, thereafter, expanding it across the globe, HOLDHEIM accepted the job offer and
4   agreed to relocate himself to California where ENGINEER.AI's office was then located.

5

6                    Offer of Stock Equity as Consideration for Employment Services

7          9.      As noted above, HOLDHEIM was induced to accept a salary substantially lower
8   than that he had received at Edelman by an offer of a 2.1% equity stake in DUGGAL's company
9   (which at the time HOLDHEIM believed was ENGINEER.AI).  During recruitment discussions,
10  DUGGAL continually stressed the value of the equity he was offering in the form of stock
11  options which, he said, would be offered at a strike price (11 cents U.S. per share) that was
12  already well under the then-current valuation.  DUGGAL claimed that the equity grants would
13  more than make up for the huge disparity in salary between what HOLDHEIM had earned in
14  salary at Edelman and what he (DUGGAL) could offer from a start-up company.  DUGGAL also
15  claimed that ENGINEER.AI was on the verge of closing an initial investment round and led
16  HOLDHEIM to believe that the round was likely to close prior to HOLDHEIM's
17  commencement of employment. It was for this reason that the Options Agreement sent to
18  HOLDHEIM was backdated to March 27, 2018 since, according to DUGGAL, investors would
19  not approve of HOLDHEIM receiving options at a strike price of 11 cents per share when they
20  were paying at a higher valuation.  DUGGAL told HOLDHEIM that after the initial investment
21  round was completed, the valuation of his stock options would be worth more than $1 million
22  dollars (guaranteeing HOLDHEIM a significant monetary windfall when his shares vested).  At
23  no time during the recruitment period or thereafter did DUGGAL inform HOLDHEIM of his
24  secret intention to induce him to accept the position of employment, and to use HOLDHEIM's
25  stature as a tool to lure investor funding, while unilaterally reserving the right to terminate
26  HOLDHEIM before his options fully vested so that he could not realize the value of the
27  consideration he had bargained for.
28  / / /

9

<u>Misrepresentations Inducing Holdheim to Relocate</u>

10.     As also noted above, while the value of the stock options was an important factor in inducing HOLDHEIM to move across the globe and accept employment with ENGINEER.AI, the largest motivating factor was the nature of the role DUGGAL had promised HOLDHEIM he would fill within the Company.  DUGGAL told HOLDHEIM that he would become the No. 2 executive at ENGINEER.AI, second only to (and in close partnership with) himself.  DUGGAL promised HOLDHEIM that he would be responsible for operations and global expansion in addition to sales, partnerships and the entire U.S. market, and HOLDHEIM valued the opportunity as an excellent next step in his career where he could leverage all of his prior work experience and success.  DUGGAL told HOLDHEIM that the position being offered to him would not only enable him to apply his corporate experience while returning to his entrepreneurial roots in a company that would do business in the U.S., India/Asia and Europe where he had previously worked, but also would give him added exposure to the technology sector.  On numerous occasions, both during the recruitment period and after HOLDHEIM started working for ENGINEER.AI in California, DUGGAL promised HOLDHEIM employment and a home for the remainder of his career that would be challenging and ever-changing – and would provide a lucrative "kicker" by virtue of his stock ownership stake.  At no time during the recruitment period or thereafter did DUGGAL inform HOLDHEIM that his promises and representations of a long-term employment opportunity were false or made without the intention to perform.  In fact, when HOLDHEIM saw the "at-will" employment clause that was included in the offer letter sent to him by Sheetal Kadyan on April 17, 2018, he objected to the clause both orally and in writing.  DUGGAL initially responded to HOLDHEIM by e-mail dated April 20, 2018, stating: "Rob – 'At Will' is a California standard clause. There is no way of adding notice - we just use the standard agreement but I'll ask nonetheless."  Thereafter, DUGGAL told HOLDHEIM that he it would cost him money he did not have to spend on legal fees to change the standard language in the offer letter, but that his concern about arbitrary termination was "not an issue" and that ENGINEER.AI would never, ever terminate HOLDHEIM's employment unless he committed theft, fraud or other criminal conduct.  As

10

1    DUGGAL was his long-time client and friend at the time (and someone he trusted),
2    HOLDHEIM accepted DUGGAL's representation and followed his instruction to sign the offer
3    letter as is with the understanding that it was merely a formality and would not alter the
4    employment relationship that he had been promised.
5
6                    Holdheim's Performance of His Designated Responsibilities
7            11.     In their numerous conversations with HOLDHEIM in the Spring of 2018 before
8    he commenced providing services for ENGINEER.AI, DUGGAL told HOLDHEIM the he was
9    being brought on board to build an operational structure and strategy, to take day-to-day
10   management off of DUGGAL's plate and to get the Company to a point where it was
11   "investment-ready" while DUGGAL focused on developing the product and attracting potential
12   investors While HOLDHEIM's business-side role was to be global, the parties agreed he would
13   start out by setting the U.S. operation on the right path by evaluating the team and making any
14   changes he deemed necessary. DUGGAL tasked HOLDHEIM with moving the Company's U.S.
15   headquarters from San Francisco to Los Angeles, to identify and negotiate partnerships with
16   cloud providers, advertising and consulting companies to build the business, and to expand
17   ENGINEER.AI's operations into other markets (Japan, the Middle East, China) as opportunities
18   arose. Early in his tenure, HOLDHEIM was asked by DUGGAL to take on responsibility for
19   global communications and Human Resources, but later apparently changed his mind on HR and
20   hired an someone in India to report to him on those issues.  Also, early in his tenure DUGGAL
21   asked HOLDHEIM to focus on managing the Company's developer network, but later decided
22   that this responsibility was better done by those with a more technical background.  HOLDHEIM
23   hit the ground running on or about May 14, 2018, in the San Francisco office, introducing
24   himself to the U.S. team, participating in phone conferences with various staff around the world
25   covering a wide range of topics from sales to marketing to technical and product issues.  Based
26   on the information he gathered during these early days, HOLDHEIM was able to begin assessing
27   inefficiencies and evaluating needed staffing and operational changes.   Two days later,
28   HOLDHEIM traveled to the India office for an 8-day trip to get to know the India team through a

                                            11
                      COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

1   series of one-on-one and group meetings.  HOLDHEIM was surprised to find the business was in
2   total disarray and that there was horrible morale amongst the India team causing disruption and
3   turnover.   Upon his return to the U.S. the week of May 28, 2018, HOLDHEIM began to
4   formulate strategies for professionalizing and improving all facets of the Company's operations
5   including structure, sales, finances/accounting, decision-making, customer service and human
6   resources.  HOLDHEIM presented a "key learnings" report to DUGGAL with recommendations
7   for necessary changes.  DUGGAL never responded to that report.

8
9                     Holdheim's Discovery of Internal Mismanagement
10                         and Discriminatory Hiring Practices
11        12.      After his first few weeks interacting with ENGINEER.AI team members in both
12   the U.S. and India, HOLDHEIM began realize that the picture DUGGAL had painted of the state
13   of business affairs at ENGINEER.AI understated greatly the dysfunction which existed within
14   the organization.  HOLDHEIM learned about gross mismanagement of the Company's finances,
15   including: (a) DUGGAL's exclusive control over revenue and accounting leading to there being
16   two sets of books and records (one set containing the actual numbers, and the other set
17   containing the numbers he showed to investors); (b) non-payment of large accounts payable to
18   vendors like Amazon Web Services (AWS) and to the Indian government, the latter ultimately
19   leading to a raid by the Indian tax authorities on the Company's offices in Gurgaon, India; (c)
20   improper transfers of funds between different entities in the "group" of companies managed by
21   DUGGAL (of which there were at least three companies -- ENGINEER.AI, Shoto and
22   HealthHunt).   HOLDHEIM discussed these irregularities with DUGGAL, who thanked him for
23   his concern, but assured him that nothing improper was occurring.   Later, HOLDHEIM
24   discovered additional internal financial irregularities, including: (d) DUGGAL's removal from
25   ENGINEER.AI's bank account and transfer to his personal account of the majority of the initial
26   $1,500,000 invested by SoftBank of Japan; and (e) DUGGAL's practice of terminating
27   employees on trumped-up charges shortly before their stock options vested in order to deprive
28   them of the compensation he had promised and they had earned.  When HOLDHEIM objected to

                                        12

1  the latter practice, DUGGAL reacted defensively, claiming that the Board of Directors had re-set
2  the vesting date for the affected employee so that options were not owed.  HOLDHEIM told
3  DUGGAL that, although he was not a lawyer, he was convinced such a practice was illegal in
4  the U.S. and insisted, for the protection of ENGINEER.AI, that DUGGAL authorize
5  HOLDHEIM to negotiate a settlement with the terminated employee to avoid potential securities
6  fraud litigation.  Another frequent topic of conversation between HOLDHEIM and DUGGAL
7  was the total lack of diversity within senior managers of the Company.  All but two of the senior
8  management team (HOLDHEIM and Alex Godelman, VP and Head of Global Engineering, both
9  over the age of 50) were substantially younger men of Indian national origin. No women at all
10  had been hired into senior management positions.  DUGGAL frequently talked about his desire
11  for ENGINEER.AI to be perceived as an American (and not an Indian) company. HOLDHEIM
12  suggested repeatedly that this would require a more diverse senior management team including
13  women, and also encouraged DUGGAL to hire older and more experienced product experts who
14  would be taken more seriously than the existing staff by corporate Chief Technology Officers
15  with whom the sales team interacted.  At one point during his tenure the Company's newly-hired
16  Head of Global HR commented in the presence of the entire U.S. headquarters office that "we
17  have enough old white men around here ...."  Nonetheless, HOLDHEIM's efforts to correct these
18  internal management mistakes and irregularities was actively met with opposition from
19  DUGGAL, who adamantly denied that the problems existed and who refused to hire the
20  personnel that HOLDHEIM recommended be hired.  DUGGAL's preference for male employees
21  of Indian national descent and stubborn unwillingness to diversify led to the departure of half of
22  the U.S. team in a matter of months, but with the exception of two junior sales employees hired
23  in or about September 2018 and one consultant, all of the candidates recommended by
24  HOLDHEIM or Godelman were rejected and dismissed by DUGGAL on the ground that they
25  were a "bad cultural fit."
26  ///
27  ///
28  ///

13

Holdheim's Discovery of Duggal's Misuse of Investor Funds

13.     During his employment with ENGINEER.AI, HOLDHEIM observed DUGGAL engage in a variety of conduct which he viewed as improper and a waste of investor funds. With regard to travel expenses. DUGGAL consistently booked first-class, non-stop airline accommodations for himself while he expected his subordinates to fly economy with multiple stops along the way, even on long flights to India and Europe. Everywhere he went, DUGGAL always stayed in extremely high-end hotels and charged that as a "business expense" to ENGINEER.AI. On those occasions when he traveled to the Company's headquarters when it was in San Francisco and, thereafter, in Los Angeles, DUGGAL usually brought along his family (wife and infant son) as well as a troop of personal assistants (including a nanny and a personal chef), and charged all of those lodging costs as a "business expense." For one month-long stay in Los Angeles County, he rented a large private residence in Beverly Hills and, when his wife did not like it, he rented another property (admitting to HOLDHEIM that he (DUGGAL) was unable to get a refund on the first property, so the cost of both properties would have to be borne by ENGINEER.AI). On the same trip, he rented an Airbnb house in a dangerous part of Inglewood near the Los Angeles airport to house a number of Indian employees he brought over from Asia for work purposes and required them to travel to his Beverly Hills rental for meetings. On another trip to the Company's headquarters where he again stayed in either Beverly Hills or West Hollywood with his wife and infant, DUGGAL imported a private chef from Greece to cook for him and his family. In order to justify his extravagant lifestyle, DUGGAL would direct his staff to come to his rented house or hotel for team meetings (or sometimes direct one or more team members to stay with him for part of the time) so that he could claim the lodging and chef expenses were "business related." As the No. 2 executive in the Company and ENGINEER.AI's Chief Business Officer, HOLDHEIM tried to determine what and how much was being expensed from the Company's revenue. Each time his efforts were frustrated by DUGGAL's refusal to grant HOLDHEIM access to the Company's books and records.

/ / /

/ / /

14

<u>Holdheim's Observance of Misuse of Tourist Visas</u>

14.    During HOLDHEIM's employment, DUGGAL regularly engaged in the practice of bringing India-based or London-based employees to work out of the U.S. headquarters in Los Angeles for extended periods of time by using "tourist Visas" even though the real reason for their travel was business-related.  As recently as January 2019, there were between 8 and 10 people working within the Los Angeles headquarters with passports from countries including Canada (1), the UK (2) and India (the remainder).  While some personnel were sometimes flown in for a specific meeting, in most instances they were brought out for weeks at a time to conduct business on a daily basis.  One employee had even complained that he was facing increased scrutiny by U.S. Customs agents because he had been brought out to Los Angeles so often and for such long periods that officials were questioning the efficacy of his supposed status as just a "tourist."  HOLDHEIM questioned DUGGAL about this potentially-illegal practice and the harm it could cause ENGINEER.AI if discovered, but was told in a hostile tone to "mind his own business."

<u>Holdheim's Discovery of Fraud on the Market</u>

15.    ENGINEER.AI positions itself as a software development platform that enables anyone – even people who do not know how to code – to convert their app ideas into reality more quickly and less expensively than building them with traditional development shops.  The Company's *Builder* platform marries a user-friendly, drag-and-drop website for the creation of app specifications with a global network of developers that can build pieces of the app quickly and inexpensively.  The entire basis of the *Builder* application development model relies on two core pieces of technology: a voluminous library of reusable features (such as a Facebook login, an automated payment system, etc.), and an artificial intelligence interface ("AI") that is able to choose and bundle the selected features upon demand. The AI is also intended to manage a network of what is represented by its founder, DUGGAL, to be "more than 11,000 developers globally."  It does this by breaking up the *custom* features (e.g., those that do not already exist in the library) into small pieces and assigning them to the most qualified and least expensive

15

1   developers in the network, where they can be developed concurrently in order to save time.

2   According to DUGGAL, it is the ability to deliver apps more quickly and less expensively than

3   traditional development shops that renders the COMPANY DEFENDANTS unique from other

4   technology companies.   To attract potential partners and, in particular, to induce investors to

5   infuse millions of dollars of capital in the Company, DUGGAL not only talked up these elements

6   in the media and in promotional efforts, but also has made spurious claims regarding the state of

7   advancement of this technology while forcing many of the COMPANY DEFENDANTS' key

8   team members to back claims which were either unproven or outright false.  As of the beginning

9   of 2019, only a small fraction of the supposed network of "11,000 developers" were registered

10   and active in the system. While numerous apps had been created, the work of unbundling re-

11   usable code features and storing them in some sort of automated and ready-to-use fashion – one

12   that would allow AI to easily access them and bundle them with other features – had yet to be

13   created, let alone deployed.  DUGGAL was telling investors that ENGINEER.AI was 80% done

14   with developing a product that, in truth, he had barely even begun to develop.  While DUGGAL

15   represented to investors and potential investors that the Company would have "100 active

16   projects" by the end of 2018, the truth was that ENGINEER.AI had signed up only 6-8 projects

17   since the *Builder* product had been launched in *beta* form in late 2017.  Of those few projects, at

18   least five clients were extremely unhappy with the work ENGINEER.AI had done for them and

19   one had even threatened to sue it for damages.  Had the sales team through some miracle been

20   able to sign on 100 new clients before the end of 2018, it would likely have broken the entire

21   fragile, manually-driven app production system.   Just like the notorious Elisabeth Holmes,

22   founder of the privately-held health tech start-up known as "Theranos" that was initially touted

23   as a breakthrough technology company (but subsequently infamous for its false claims and fraud

24   on investors), DUGGAL had successfully lured a number of highly-reputable venture capital and

25   tech investors to infuse $29.5 million dollars of capital in ENGINEER.AI when its principal

26   product (*Builder*) did not work as promoted and was essentially nothing more than "smoke and

27   mirrors."  The more HOLDHEIM called out DUGGAL for misrepresenting the capabilities of

28   the *Builder* product and the more he warned DUGGAL of the potential for investor fraud, the

16

1    more DUGGAL excluded HOLDHEIM from investor and partner meetings despite the fact that
2    he was the second highest-ranking executive within the Company.   Indeed, in or about
3    September 2018, HOLDHEIM implored DUGGAL to be more honest about the actual state of
4    product development in meetings with investors and potential investors.   DUGGAL dismissed
5    HOLDHEIM's advice, offering a response that revealed his true character: "every tech startup
6    exaggerates to get financing -- it's the money that allows us to develop the technology."
7    Although deeply disturbed by DUGGAL's Machiavellian response, HOLDHEIM still believed in
8    DUGGAL and the Company's original mission, so he let DUGGAL deal with investor funding
9    while devoting his best efforts towards legitimizing and diversifying the Company.   As described
10   elsewhere in this Complaint, HOLDHEIM's efforts to identify and cure a number of internal
11   management problems were not well-received and ultimately caused DUGGAL to terminate his
12   employment without good cause.

14                  Holdheim Engages in "Protected Activity" to Stop Duggal's
15                  Unlawful Business Practices (and Resulting Marginalization)

16          16.     During his employment, HOLDHEIM developed a reputation as someone who
17   was not afraid to speak his mind when it came to operational management decisions which he
18   felt were problematic or against ENGINEER.AI best interests.   While not necessarily the most
19   "politically correct" thing to do given DUGGAL's managerial immaturity, HOLDHEIM would
20   regularly speak up and voice concerns and complaints about the certain business practices and
21   choices which he disagreed with.   Not only did HOLDHEIM believe this was the right thing to
22   do, but he felt this was his responsibility as the No. 2 executive and Chief Business Officer to
23   identify and correct practices such as these. With regard to DUGGAL's consistent pattern and
24   practice of using scarce company resources to pay for his extravagant travel, lodging and
25   personal expenses, HOLDHEIM voiced to DUGGAL that he believed such conduct was
26   dishonest and possibly fraudulent on several occasions, but his objections were ignored. With
27   regard to ENGINEER.AI's questionable financial practices -- especially the lack of a qualified
28   Chief Financial Officer and the fact that DUGGAL exclusively managed the Company's books

                                                17

1   and records -- HOLDHEIM repeatedly raised concerns about the propriety of his conduct as well

2   as the potential for Company liability if his actions were challenged by investors as potentially

3   fraudulent.    DUGGAL ignored these complaints and concerns as well. With regard to

4   DUGGAL's practice of terminating employees before their stock option grants would vest,

5   HOLDHEIM repeatedly voiced his complaints which DUGGAL also ignored.   The closer

6   ENGINEER.AI came to closing its investment round, the greater urgency HOLDHEIM felt to

7   raise and address these issues. The presence of outside investors exponentially increased the

8   seriousness of activities of questionable legality and ethics.  DUGGAL grew increasingly hostile

9   to HOLDHEIM for raising these issues and, as a result, took up residence in the U.S.

10   Headquarters in December 2018 for an extended period to wrest back full control of the

11   Company and to marginalize HOLDHEIM's role.  Soon thereafter, DUGGAL began to exclude

12   HOLDHEIM from more and more team meetings and worked exclusively with his staff to ensure

13   that they followed his (DUGGAL's) directions and not HOLDHEIM's.

14

15   Holdheim's Other "Protected Activity"

16        17.     During his employment tenure with ENGINEER.AI, HOLDHEIM engaged in

17   other "protected activity" which he is informed and believes may have precipitated his eventual

18   termination.  For example, throughout his tenure, HOLDHEIM observed that DUGGAL gave

19   disproportionate preference in younger, male employees and to those of Indian national origin.

20   DUGGAL initially did not dispute that he gave preference to these categories of employees, but

21   rationalized his selections by claiming that he could not find qualified personnel and had no

22   choice but to hire those who were available.  DUGGAL told HOLDHEIM during the first month

23   of his employment that the principal reason why he (DUGGAL) had hired HOLDHEIM as the

24   Chief Business Officer and, later, Alex Godelman as Vice President and Head of Global

25   Engineering, was to add "seasoned" and "experienced" senior managers to assist the company in

26   developing a more diverse workforce. However, HOLDHEIM observed that both he and

27   Godelman were the only older and experienced workers hired and realized that DUGGAL used

28   the two of them to create the appearance of legitimacy in meetings with potential partners and

18
COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

investors in ENGINEER.AI. With regard to the lack of diversity in the senior management team, the potential of discrimination liability and the need to hire more experienced and seasoned employees (including women and non-Indian employees), HOLDHEIM repeatedly voiced concerns and raised complaints about the issue to DUGGAL, but those complaints were ignored. DUGGAL blocked HOLDHEIM's efforts to hire new employees to create a more diverse workforce and insisted on bringing on younger, inexperienced personnel principally from India (most, if not all, of which brought to the United States to work on "tourist visas" under the pretense of leisure travel when the true purpose was to perform business activities). When DUGGAL ignored HOLDHEIM's advice and recommendations to correct the Company's potentially discriminatory practices, HOLDHEIM escalated his concerns by documenting some of the irregularities in e-mails sent to DUGGAL in the 4th Quarter of 2018 which, on information and belief, he shielded from investors and others as he sought to raise additional capital. In response, HOLDHEIM was totally marginalized by DUGGAL, directed to refrain from coming to the office, excluded from important meetings. and disinvited to the Company's holiday party.

### Termination of Holdheim to Prevent Vesting of Stock Equity Interests

18.     On Friday, February 1, 2019, almost immediately after DUGGAL had finally fully closed the first round of investor funding and confirmed to HOLDHEIM in a conversation between them that he had been hired to be No. 2 executive within ENGINEER.AI, HOLDHEIM was abruptly terminated from his employment as Chief Business Officer of ENGINEER.AI on concocted and pretextual grounds. Specifically, HOLDHEIM was summoned to a conference room meeting by his colleague, Alex Godelman, where ENGINEER.AI's newly-hired Human Resources Manager, Ronda Fraley, was waiting. At that time Ms. Fraley told HOLDHEIM that it had come to management's attention that HOLDHEIM had forwarded some e-mails to his personal email address, that doing so "was against company policy" and that, as a result, management had decided that to terminate his employment immediately. HOLDHEIM asked Ms. Fraley to identify the "company policy" he allegedly had violated, but she was unable to do so. Neither did Ms. Fraley identify which e-mails (or the content of such) that had been

19

1   supposedly been forwarded in violation of the unidentified policy.  When HOLDHEIM asked
2   Ms. Fraley to repeat the ground(s) for termination, she stated again that it was because he had
3   "forwarded work emails to your personal email address."  <u>Notably, no claim was made that</u>
4   <u>HOLDHEIM had failed to dutifully and loyally serve the company during his tenure or that he</u>
5   <u>failed to competently perform his job duties and responsibilities.</u>  HOLDHEIM was then
6   summarily escorted from the ENGINEER.AI offices without his final wages and without
7   notification of his COBRA rights.  Although Ms. Fraley subsequently identified the dates on
8   which HOLDHEIM allegedly forwarded e-mails to his personal e-mail account, he was given
9   none of those documents to review or examine. HOLDHEIM is informed and believes that at no
10  time did he ever forward e-mails containing "trade secrets" or proprietary data, let alone steal any
11  confidential or trade secret information as was implied.  In addition, HOLDHEIM's repeated
12  requests for a copy of the "company policy" he allegedly violated and cited as the basis for his
13  termination were ignored entirely.
14
15                          **FIRST CAUSE OF ACTION**
16                       **FOR WRONGFUL TERMINATION IN**
17                        **VIOLATION OF PUBLIC POLICY**
18                  (Against the COMPANY DEFENDANTS and DOES 1-50)
19       19.    HOLDHEIM repeats, realleges and incorporates by reference each and every
20  allegation set forth in paragraphs 1-18, above, as if set forth herein in full.
21
22                      Public Policy Against Discrimination
23       20.    At all times mentioned herein, California Government Code § 12900 *et seq.* (the
24  "FEHA") was in full force and effect and was binding upon ENGINEER.AI, and each of them,
25  and each of its employees.  Section 12921(a) of the FEHA provides as follows:
26              "(a)    *The opportunity to seek, obtain and hold employment*
27              *without discrimination because of* race, religious creed, color,
                *national origin,* ancestry, physical disability, mental disability,
28              medical condition, marital status, sex, *age,* or sexual orientation *is*
                *hereby recognized as and declared to be a civil right.*"

                                      20

1   Emphasis added.  The above-enumerated statute (and others) sets forth the "public policy" in
2   California which prohibits employer discrimination in favor of or against any employee on the
3   basis of their national origin or age, among the other-identified protected groups.

4

5                   Discriminatory Discharge in Violation of "Public Policy"

6         21.     HOLDHEIM is informed and believes, and thereon alleges, that the COMPANY
7   DEFENDANTS terminated his employment because of, alternatively, his Caucasian (non-
8   Indian) national origin and/or his age (53 years old) in breach of their statutory obligations under
9   California law.  HOLDHEIM is informed and believes, and thereon alleges, that the articulated
10  reason offered for his termination -- *e.g.*, that he violated a "company policy" that prohibited him
11  from sending any e-mail from his work e-mail account to his personal e-mail account, regardless
12  of content -- was not the true reason for his discharge, but rather was a pretexual reason and a
13  coverup for unlawful national origin and/or age discrimination against him in violation of
14  California's "public policy" against discrimination.  HOLDHEIM is informed and believes, and
15  thereon alleges, that the COMPANY DEFENDANTS' CEO, DUGGAL, and other senior
16  executives frequently forwarded e-mails from their work e-mail account to personal and other
17  non-company e-mail accounts during HOLDHEIM's tenure without consequence and without
18  being terminated (as will be confirmed by examination of DUGGAL's and other's work e-mail
19  accounts during the discovery process unless DUGGAL destroys or directs the destruction of
20  such evidence in response to the filing of this Complaint).  HOLDHEIM is further informed and
21  believes that, there was no written or published "company policy" prohibiting the sending of
22  company e-mails to other e-mail addresses contrary to what he was told by Human Resources
23  Manager, Ronda Fraley, at the time he was terminated (as evidenced by Ms. Fraley's inability to
24  send a copy of such a policy to HOLDHEIM in response to his written request immediately after
25  his termination).
26  ///
27  ///
28  ///

                                        21
                        COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

Damages

22.   At the time of his discharge, HOLDHEIM was earning substantial wages with bonuses, health insurance, stock options and other benefits, and could have been eligible, had he been retained, for pay raises, additional bonuses, vesting of the $1,000,000 worth of stock options granted to him by SD SQUARED, and grants of additional equity ownership in the future.  As a direct result of his wrongful termination in violation of public policy, HOLDHEIM has suffered lost wages, lost employment benefits, lost bonus compensation, and lost equity interests which are believed to be in excess of $500,000 annually.   The precise amount of damages sustained by HOLDHEIM has not yet been ascertained and is subject to proof at trial.

Emotional Distress Damages

23.   As an additional direct result of his discharge in violation of public policy, HOLDHEIM has suffered significant personal, emotional and economic injuries (including, but not limited to, loss of wages, loss of bonuses, loss of employment benefits and other forms of employment compensation), emotional distress and/or physical health problems resulting from emotional distress caused by and occurring after his termination, loss of self-esteem, embarrassment, humiliation and mental anguish.  The precise amount of damages sustained by HOLDHEIM has not yet been ascertained and is subject to proof at trial.

Punitive Damages

24.   The actions inflicted upon HOLDHEIM by DUGGAL in his capacity as CEO of the COMPANY DEFENDANTS constituted a wrongful termination in violation of public policy and were made in complete disregard of HOLDHEIM's employment rights and with the malicious intent to deprive him of the benefits of his bargain when he accepted the position of employment offered to him by DUGGAL on behalf of the COMPANY DEFENDANTS (and with malicious or reckless disregard of the personal and economic injuries that would be caused to HOLDHEIM).  In doing the wrongful things herein alleged, the COMPANY DEFENDANTS were motivated by personal animosity, spite and ill-will toward HOLDHEIM in a desire to

22
COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

1  injure, vex, harass and annoy him, and acted with the wrongful motive, intent and purpose of
2  depriving HOLDHEIM of the rights, benefits, protections, entitlements and security of his
3  employment, knowing that they had no right to do so and fully intending the harm, both financial
4  and emotional, which it knew would result from the wrongful termination of his employment.
5  HOLDHEIM is informed and believes, and on the basis of such information and belief alleges,
6  that the acts and conduct of the individuals who participated in such discrimination were
7  expressly authorized by corporate officers of the COMPANY DEFENDANTS (including, but
8  not limited to, defendant DUGGAL) *prior to* the occurrence of such unlawful conduct, and were
9  subsequently authorized and ratified by the Board of Directors of the COMPANY
10 DEFENDANTS (including, but not limited to, the lead investors in the Series A financing round
11 announced on November 6, 2018, including the venture capital firms Lakestar and Jungle
12 Ventures, and SoftBank of Japan) *after* such unlawful conduct occurred.  The COMPANY
13 DEFENDANTS' conduct was malicious and oppressive and, by reason thereof, HOLDHEIM is
14 entitled to exemplary and punitive damages in an amount according to proof at trial.

15

16                          **SECOND CAUSE OF ACTION**
17                          **FOR AGE DISCRIMINATION**
18                    (Against the COMPANY DEFENDANTS and DOES 1-50)
19                          Incorporation by Reference
20      25.      HOLDHEIM repeats, realleges and incorporates herein by reference each and
21 every allegation set forth in Paragraphs 1-18, and Paragraphs 20-21, above, as if set forth herein
22 in full.

23

24                          Prohibition Against Discrimination
25      26.      The COMPANY DEFENDANTS, and each of them, are companies engaged in
26 interstate commerce in the United States and subject to the California statutes, laws and
27 regulations governing all employers with five or more employees.  At all times mentioned
28 herein, the FEHA was in full force and effect and was binding upon the COMPANY

23

1   DEFENDANTS, and each of them, as well as on each of their respective employees (including

2   DUGGAL).   The FEHA requires employers to refrain from taking any actions which

3   discriminate (or have the effect of discriminating) against any employee on the basis of any

4   statutorily protected classifications including, without limitation, one's national origin or age.

5   For example, Section 12940(a) reads as follows:

6           "It shall be an unlawful employment practice, unless based upon a
        bona fide occupational qualification, or, except where based upon
7       applicable security regulations established by the United States or
        the State of California:
8

9               (a)   For an employer, because of the race, religious creed,
10          color, national origin, ancestry, physical disability, mental
            disability, medical condition, marital status, sex, age, or sexual
11          orientation of any person, to refuse to hire or employ the
            person or to refuse to select the person for a training program
12          leading to employment, or to bar or to discharge the person
            from employment or from a training program leading to
13          employment, or to discriminate against the person in
            compensation or in terms, conditions, or privileges of
14          employment."
15

16

17  Emphasis added. The above-quoted statute prohibits California employers from discriminating

18  against its employees on the basis of their national origin or their age.  Although this lawsuit is

19  not predicated on Federal law, similar proscriptions against age discrimination exist under

20  Federal law, as codified in Title VII of the Civil Rights Act of 1964, as amended (which forbids

21  an employer: "to ... discharge any individual ... because of such individual's ... national origin

22  [or] age ...."), at 42 U.S.C. § 2000e-2(a)(1).

23

24                          Discriminatory Discharge

25          27.   The COMPANY DEFENDANTS were aware of HOLDHEIM's national origin

26  (Caucasian) and age (53 years old).  HOLDHEIM is informed and believes, and thereon alleges,

27  that a substantial factor, but not the only factor, in DUGGAL's decision made in his capacity as

28  CEO of the COMPANY DEFENDANTS to terminate HOLDHEIM's employment was his

---

24

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

1  national origin and/or his age.  HOLDHEIM is informed and believes that the evidence will
2  establish that he was terminated on false and pretextual grounds concocted by DUGGAL and his
3  attorneys.  Thus, the termination of HOLDHEIM's employment was in violation of the FEHA's
4  proscription against discrimination as codified in Government Code § 12940(a).  Such
5  discrimination has resulted in damage and injury to HOLDHEIM as alleged herein.
6
7                              <u>Other Discriminatory Practices</u>
8        28.    HOLDHEIM is informed and believes, and thereon alleges, that the COMPANY
9  DEFENDANTS have a pattern and practice of discriminating against older Caucasian employees
10  and that this pattern is evidenced, in part, by their recruitment and hiring practices at
11  ENGINEER.AI and at the associated companies overseen by SD SQUARED.  HOLDHEIM is
12  further informed and believes, and thereon alleges, that the COMPANY DEFENDANTS' pattern
13  and practice of discrimination is evidenced, in part, by giving preference to employees from
14  India and a statistical under-representation of older, non-Indian persons in management positions
15  in their respective workforces.  HOLDHEIM is informed and believes that, in addition to the
16  statistical under-representation of older non-Indian workers in senior management positions as
17  described herein, the COMPANY DEFENDANTS have engaged in other discriminatory
18  practices which are not fully known by HOLDHEIM for which discovery will be taken.
19
20                            <u>Pretextual Reason for Discharge</u>
21        29.    As alleged hereinabove, HOLDHEIM was terminated on February 1, 2019, by
22  Ronda Fraley, the Human Resources Manager of ENGINEER.AI.  At that time Ms. Fraley told
23  HOLDHEIM that it had come to management's attention that HOLDEHIM had forwarded some
24  e-mails to his personal email address, that doing so "was against company policy" and that, as a
25  result, management had decided that to terminate his employment immediately.  HOLDHEIM
26  asked Ms. Fraley to identify the "company policy" he allegedly had violated, but she was unable
27  to do so.  Neither did Ms. Fraley identify which e-mails (or the content of such) that had been
28  supposedly been forwarded in violation of the unidentified policy.  When HOLDHEIM asked

25
COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF